The matter of Time Warner v. Federal Communications Commission and related cases. The matter of Time Warner v. Federal Communications Commission and related cases. I think the way that we would like to proceed, Your Honor mentioned two issues in the case, and I think they break roughly along the lines of statutory arguments and an arbitrary and capricious argument with respect to the computer inquiry rules. What we would propose is that I would first address the application of the Supreme Court's Brand X decision to the statutory classification issue in this case. Counsel for EarthLink, Ms. Lampert, has planned to address the Commission's failure to properly follow the statutory processes for deregulation and discontinuance of existing telecommunications services. I think those two probably most neatly group together, and that would be followed by Mr. Murray for Time Warner Telecom addressing what is a fairly distinct issue, which is the Commission's failure to assess market conditions for the distinct market for medium and large business customers. All right, you're going to begin, Mr. Butler, and then your argument will be responded to by the agency's counsel. That's the way I envision it. You're going to have argument, response, argument, response. And so I'll have three sets of six? You'll have three sets instead of two. Okay, that's all? All right, who's going to respond to your argument, Mr. Butler? I believe that perhaps Mr. Carr and Mr. Kellogg? Mr. Carr? Your Honor, I'm here on behalf of the FCC, and I'll presumably be responding to each set of arguments. Mr. Kellogg is here on behalf of the Allied Interveners. He may be getting up two or three times or maybe just once, but he'll also be asking. It seems to make sense because you have major issues, and just to keep things together, it seems to make sense to hear the argument and hear the response. One question that we were wrestling with was which – you mentioned two issues, and it was not entirely clear to some of the counsel which two issues you had in mind. I was thinking of the integration order and then the consumer inquiry issue. Those two issues. The first issue, again, Your Honor? The first one had to do with the integration of information service and telecommunications. The classification issue. The classification issue. The way you refer to it. That I would consider the first issue. And then the second issue would be the general issue concerning the consumer inquiry. Okay. Okay. That's the way I was thinking of it, but I don't – If there's three breakdowns, how do you propose a time? Because if there's two, I guess it would have been 15 and 15. That's up to Your Honor. Well, that's part of the question for me. Judge Greenberg, I think that would just take us back to the time allocation that we had originally indicated to the court. If we could do that, I don't think we could just go for 30 minutes and then the agency would get 30 minutes. It's not just too difficult to separate them. I don't necessarily think it's too difficult. I think the only problem here and the only thing that might make it a little confusing for the court is that Earthling's arguments, in a sense, span both. They have statutory component, but they also speak to the computer information. Because it's three issues and you have to do 10 minutes each. You have to do it within half an hour. Right, and that's what we originally intended. The only twist here is that the responses would come immediately, and we have no problem with that. We're more than happy to do it that way. I think we're going to go back to the original plan and let you have the 30 minutes because it's becoming – I thought we could simplify things, but it's becoming more confusing. We might have told you before the argument. You might have been able to work it out. But as it stands, it's probably just as well to keep the game plan the way it was set. That's fine, Your Honor. We have no problem with that. It's a simplification. Thank you. Now you're going to ask for a rebuttal. Mr. Butler, you want one minute? Yes, Your Honor. Are you going to be nine minutes? Yes, Your Honor. That's correct. Very well. Mr. Butler. Thank you, Your Honor. With respect to Brand X, the commission is correct that the Supreme Court's Brand X decision governs the statutory classification issue in this case. That doesn't mean, however, that Brand X provides a basis upon which this court may affirm that statutory classification decision. To the contrary, we argue that Brand X requires that this court reverse. The reason for that is simple. Under SEC v. Chenery, this court may affirm, if at all, only on the basis provided by the commission. The commission, in its order, with respect to the statutory interpretation issue, relied entirely on the Brand X case. The problem for the commission is aligned solely on Brand X. It's that Brand X turned on facts, and the facts here are dispositively different than the facts that the court found in Brand X. Now, in Brand X, the Supreme Court did two things. The first thing that it did was to determine that the word offer in the definition of the defined term telecommunications service was ambiguous. And we, of course, don't dispute that here, nor could we. But the second thing that the court in Brand X did, and this is what governed this case, was to make a determination under the second prong of Chevron as to whether the FCC's interpretation and application of the word offer was reasonable. Now, in conducting whether it was reasonable in Brand X, why isn't it reasonable in the order in this case? Because of the reason that it was reasonable in Brand X. What the Brand X court found determinative was the fact that the transmission component of cable modem service is always and only provided in connection with the information processing component of that service. And the court said at least five times that it was critical that the transmission service was used, again, only as a component of the combined service. The court put the question and the analysis this way, and this is just one of several examples. This is in 125 Supreme Court, 2704, 2705. The question then is whether the transmission component of cable modem service is sufficiently integrated with the finished service to make it reasonable to describe the two as a single integrated offering. We think that they are sufficiently integrated because a consumer uses the high-speed wire always in connection with the information processing capabilities. But the court made essentially the same statement at least four other times in its decision. And what's different in this case? What's different in this case is this. The record here is clear, and the commission doesn't contest this, that with respect to DSL transmission, although that DSL transmission is sometimes offered in conjunction with the information processing service so as to provide Internet access, it's also the case that DSL transmission is offered on a stand-alone basis without that piece. But, Mr. Butler, the court in Brandeis said that the analysis is done from the standpoint of the customer, if I'm correct. That is from the end user. That is the person that sits perhaps at the monitor. And I just learned today, incidentally, that this building is wireline. So is the building that I use across the river. But when I sit in a computer, I'm oblivious to how the message signal comes through. I really don't think of that. And that's what I thought the Supreme Court was saying from the standpoint of the user. It's a complete service, an integrated service. That's the analysis I thought that the Supreme Court had done in Brandeis and the one that the FCC did here. That's correct with respect. That's really the first part of the analysis. It is quite correct that the Supreme Court looked from the viewpoint of the user. The key difference here and the key problem with the commission's argument is you have to be very clear about what it is you're looking at from the standpoint of the user. And what the Supreme Court was looking at was not what the user could do with that service once he buys it. The question in front of the Supreme Court was whether when the user purchases that service, he sees one service or two. And in deciding that second question, which is what the question was before the court, the court found it determinative that the service, the transmission service, was always and only provided in connection with this other service. With respect to DSL, that is not the case. DSL service is also offered as a standalone transmission service. In the paragraph 95 of the order, this is the joint appendix at 61, the commission said, as it had said many times before, something can't be at the same time a common carrier telecommunication service and also not. So the situation the court was presented with was a snapshot in time in Brandeis. They started with a proposition that the entire universe of cable transmission service was used for the purpose of Internet access, and that was the determinative fact in Brandeis. It was a very narrow polling, and that is not the case here, and the commission does not contest that. What's the practical consequence of this order on your clients and people in the class? The practical impact. The DSL transmission and other transmission that can be used for Internet access is something that is bought at wholesale by competing carriers in order to, in turn, provide their services to the public. So the practical impact is that we, after this order, do not have a statutory right to purchase those inputs to use to provide competition to the public. But it's a competitive market. I mean, if the price is right, why would you not be allowed to compete and purchase? This classification decision is not about policy. It's not about whether it's right to regulate or not. It's whether or not this service falls into a particular classification. What the commission has tried to do is turn this into a case about policy, and they've taken a narrow case from the Supreme Court that said, we're not dealing with policy, we're dealing with a classification. Leave the policy to you, and they're trying to bootstrap that into something much larger. Aren't you afraid that you're going to get hijacked on the race? Either hijacked on the race or not provided the service at all, and that's already happening in some cases. I guess it's for ISPs, Internet Service Providers? Correct. But this service is also used by other communication service providers to offer services other than Internet access. It's used for teleworking applications. It's used to hook multiple buildings from businesses in different locations. So you're afraid, what, that you're going to be priced out of competition? Well, as a practical effect, there are two possibilities. One, if it's completely unregulated, companies can charge whatever the market will bear. As it is today under 201 and 202, it's not price regulated per se, but there's a requirement that the prices be non-discriminatory and reasonable. That will go away. So the classification itself will affect you economically? It fundamentally affects the ability of other carriers and consumers to purchase this service on demand and at reasonable rates. And you can't run without it? Correct. So there's a lot of money involved here? There's no question about that, and there are a lot of consumers involved here. I say I'm out of time. When you say consumers, you mean all your customers? That's correct. Not all the customers. I represent a trade association. There's a wide range of different types of customers that will be affected. Mr. Bowman, thank you very much. Thank you. Ms. Lambert? May it please the Court, my name is Donna Lambert on behalf of Petitioner Earthlink. I'd like to reserve two minutes of my time for rebuttal. In the order of the review, the SEC substituted its view of what communications laws should be for what the Communications Act and substantial precedent actually requires. While the SEC seeks to depict its sweeping action as solely a change of its computer inquiry rules, the fact is the effect of this decision eliminated numerous sections of the Communications Act applicable to existing Title II telecommunications services, including service discontinuance requirements, customer privacy requirements, cross-subsidization protections, enforcement provisions, and the delineated process for deregulation. All parties to this case agree there is an existing telecommunications service, the broadband telecommunications service provided by the telephone companies, that was provided not only to retail consumers, but to wholesale customers like Earthlink, who use this service to provide hundreds of thousands of consumers throughout the U.S. Internet access and other information services. And the statute does not afford the authority to the SEC simply to ignore Title II without conducting any market analysis and without any inquiry as to how existing customers will be affected. Is a market analysis really required? The Supreme Court seems to say in Brand X that a market analysis was not required. In Brand X it was a new service and it was never a thing. Well, I think to me if it's good enough for the Supreme Court, would it be good enough for us? Well, certainly with respect to cable services, no question. There was never an existing Title II service as there is here. And, in fact, whatever lawful path the SEC could have gotten to deregulate, whether it was Section 10 forbearance or classification under the name of precedence, or just discontinuing under Section 10. I'm sorry, you mean the preexistence of wireline services is what requires that there has been a market analysis? Correct. Once there are existing Title II telecommunications services, the statute sets forth the way that the SEC could if the market conditions in the public interest, which is what the SEC and the courts have defined as the market conditions, show it would be in the public interest to eliminate those existing telecommunications services. And I believe in the Brand X opinion the Supreme Court even referred to the forbearance as the mandatory forbearance that applies to existing telecommunications services. And as counsel for content just noted, there were never any stand-alone telecommunications services in the cable context. But here there were. The SEC conceded in its brief, in its order rather, in Paragraph 106, JA 70, and there's no question that customers like Erfman, who have served hundreds of thousands of consumers throughout the U.S., were missing customers with all of those rights to enforcement and protection of information under the privacy rules and so forth. And the FCC, notably, all of the precedent it cites for discontinuance under Section 214, for classification under the Nehru test, don't actually support its position. They go the other way. This is a field in which Congress is extremely interested in a lot of statutes. And the FCC, and it's not just in theory, sometimes I think when they say agencies have the expertise, sometimes I think it's the theory of it, but I think this is real. Why don't you ask Congress? Because Congress could change this, couldn't it? I think, Your Honor, that's the question we have for the FCC. Maybe they need to go back to Congress and say, you know, this is the rule. No, but the FCC has indicated what they think the rule should be. But you can circumvent that, can't you, by getting Congress to see it becomes now a political issue. Congress can say that's not what we intended. That's true. Whatever Congress may or may not do in the future is certainly up for debate. But the way the law is today, and in this case, the FCC does not state its changing its interpretation of the law. The way the law is today for existing telecommunications services, with active customers like Earthlink and all the consumers we serve, services cannot simply be discontinued because the FCC would prefer a different statutory framework to govern communications services. There's a process that goes through, and we are not here to say that in no markets could the FCC have said legitimately, maybe you're a fantastic alternative in Philadelphia, but it doesn't tell us whether we're in Montpelier, Vermont, or Topeka, Kansas, or anywhere else in the U.S. Forecasting and predicting where the markets will go is something that the Supreme Court has said is uniquely part of the FCC's function. Right, and absolutely we agree, and to the extent that the applicable question was up in the air and the FCC does indeed have a lot of expertise, there's no question. But here, not only does the record of evidence not support the FCC's predictions, the FCC's own data, but more importantly, the statute, Section 214, requires that the FCC look as to how existing customers will be affected, the present public interest convenience and necessity, and the FCC's own rules. And every single instance it's ever applied those rules, it says it must be sure that existing customers, like Earthling, have somewhere else to go, alternatives to turn to before services are just cut off. Is it the purpose to create a competitive environment in wireline services? Well, certainly Congress's view in enacting Section 214 was to make sure that existing customers don't get cut off from services. But I think part of the question, Your Honor, goes to what the FCC has depicted, which is this is just a question of changing its policy and changing its rules. And the rules that it refers to actually had a very important purpose, to promote independent, diverse information services provided not only by the telephone company and also facilities, but by companies like Earthling and the next Earthling that might come around. And what the FCC here has seemed to implicitly assume without stating is that the only information services that are of any importance are the ones provided by the ones who own the pipe. And that's a radical change in position over decades, 30-something years, of a policy where the FCC has said in 2001 and many, many times that these independent information services provide a great benefit to the American people. The FCC seeks to rely, as I said, on its predictive judgment, which has no place in this decision. But beyond that, the FCC also says it doesn't need to conduct a market analysis because a market is too dynamic and evolving. And we submit that dynamic and evolving is what the FCC's job is, and it successfully and often conducts market analysis. That seems to be quite true, actually. I mean, as I look at the cable industry over the past 25 years, incredible changes have taken place, and the agency seems to predict that those changes in technological innovations are going to continue. Wasn't it uniquely within their authority to make that kind of forecast and prediction? It certainly is, but to the extent that it's required in particular circumstances, it has defined the public interest as requiring a market analysis. And to the extent it has defined the public interest to require a market analysis, it can and often successfully does conduct those market analyses. It failed to do so here, and we submit the reason is because the evidence shows that in many communities that competition simply doesn't occur. Up to 45 percent of consumers in California, the California Public Utilities Commission put this in the record, have no alternatives to the DSL services provided by the telephone companies. And for that reason, we think that the FCC preferred to stay away from the market analyses. And we don't ask the court to decide whether there is or isn't competition in various areas in this country, but rather to send the case back to the FCC and require them to conduct the market analyses before allowing the discontinuance of the services so that ultimately the consumers who are using these services are not harmed. You said there's some competition between Internet service providers? Is that your point? No, I think certainly up until the time of disorder, there's a rigorous competition between Internet service providers, and it was certainly Erkin's hope that that competition would be allowed to continue because we believe that our product is a wonderful product for consumers in the marketplace. But to the extent we are foreclosed from getting access to the underlying transmission capacity that we need to reach those consumers, the consumers will never know what the benefits for our product are. Isn't the deregulation at the ILEC level going to affect all of your competitors at the ISP level? Well, yes, except for the competitors who own the facilities, and that's where we contend that the FCC is essentially rewriting. So there's vertical integration. Correct, and we are contending that the FCC is rewriting the Communications Act to what it believes is a preferable framework. Okay. Mr. Cranford, thank you very much. Mr. Murray? Good morning, Your Honors. May I please report? David Murray for Petitioner Time Warner Telecom. I'd like to reserve one minute of rebuttal. We're challenging only one aspect of the order, and that is the FCC's failure to examine the level of competition for the transmission inputs used to provide Internet access services to medium and large businesses, the wire lines that come into this court and to your office across the river. The FCC has historically referred to these business customers as the enterprise market and has distinguished the enterprise market from consumers and small businesses, which it has called the mass market because they use different services and require different network elements. Under Title II of the Communications Act, the FCC has a statutory duty to ensure that bottleneck facilities owned by an incumbent local exchange carrier or an ILEC are made available to carriers, to competitors, on just, reasonable, and non-discriminatory terms. Now, critically, in paragraph 43 of the order, the FCC acknowledged that wherever ILECs, the incumbent local exchange carriers, maintain monopoly control over the transmission inputs used to provide Internet access services, then continuation of the computer inquiry rules is, quote, essential, close quote, and it's essential to ensure that the benefits of any improvements that are introduced into an ILEC's transmission facilities to accommodate the needs of its own broadband services are made available to competitors on non-discriminatory terms. What's the impact? Without that access, without access to the next generation of transmission facilities, other broadband service providers cannot compete in the quality, the speed, the capacity, the security, and other factors that are going to make the next generation of Internet access services much greater, but they will be exclusively owned and controlled by the incumbent local exchange carriers. The record before the FCC showed that the ILECs, in fact, retain monopoly control over these transmission facilities in the enterprise market, providing the sole source of network connectivity for about 98% of the nation's medium and large businesses, and we catalog this record evidence at our opening brief, pages 42 to 43. We've also submitted to the court as a 28-J filing a very recent report from the GAO, which confirmed that there is virtually no competition for these transmission facilities in the enterprise market, and the GAO went on to predict that there's no reason to believe that it will ever exist because of the high entry barriers and associated costs. What's going to happen, Mr. Murray, when the non-discriminatory rules are lifted? Is it going to create havoc out in the business community? It is, Your Honor. It's going to create havoc because the incumbent local exchange carriers will be free to upgrade the transmission facilities that they use to provide their own Internet access services, and all that will be left for competitors are the existing lines, which will become increasingly obsolete, and the ILECs will also have the incentive to divert capacity away from those lines so they'll become more difficult to get, and ultimately competitive Internet access services are going to fall by the wayside. That's the problem, and that's exactly what the computer inquiry rules were designed to protect against. Wouldn't Congress step in if it actually worked out like that? Well, I don't think Congress needs to step in because it already has. It spoke when it enacted Title II, and it said, and the FCC has agreed, if we find that ILECs continue to maintain bottleneck control over essential transmission facilities, then continued regulation under Title II is essential. That's the FCC's own analysis. You say Congress stepped in, but the FCC doesn't think so. I remember well when the Supreme Court made some decisions in the late 1980s and early 90s under the discrimination laws, and they thought they were doing what Congress wrote, and Congress came back and, in effect, overruled the opinions of the Supreme Court by amending the law to make it clear to the public that the Supreme Court had a law. Well, Your Honor, I think that if it was left to that, there could be a loss of competition between now and then that will be devastating to the national economy that is not going to be reparable, and it would be, in our view, a violation of the FCC's statutory duty under Title II to allow that to happen. If you look through this order, Your Honor, and I can cite you paragraph 47 through 55, 64, 71, 76, 79, 84 to 85, every one of those paragraphs the FCC is analyzing competition from cable companies and, to a lesser degree, fixed wireless and satellite providers, and the record shows that none of those technologies exist to any meaningful extent in the enterprise market, and they can't. Cable companies built that to serve homes, and those cable wires do not have the capacity for the high-speed, high-security, high-reliability services that businesses like this court require. And fixed satellite and fixed wireless, if a big cloud storm comes in or you've got rain, you can have disruption and loss of the service. A business can't rely on that sort of Internet access, so that's why it was so critical for the FCC to examine the competitive conditions in the enterprise market, and you will search high and low in this order for any discussion of that fact. And in front of the FCC was lots of record evidence showing, as I just described, that 98 percent of businesses in America are getting exactly what this court is, wireline access for their Internet services from the local exchange cable. You seem to present a somewhat of a doomsday scenario if these nondiscriminatory rules are lifted. Not to disparage the importance of your point, but isn't there a procedure where if you were prevented from effectively participating, you could petition the FCC for some sort of relief? Yes, but, Your Honor, I think this court had the opportunity to take a look at this record, to take a look at the statutory obligation that the FCC has, and I think if the court examines the record, you will find it is inescapable. The FCC simply dropped the ball. In every other proceeding before and after this order, the FCC has always differentiated between mass and enterprise markets, and they have said in the tyrannical review order, and most recently in the Omaha forbearance order, that the competitive conditions in the mass market are not the proxy for the separate enterprise markets. Let's go back to Ms. Leopold's point that the FCC should have done a market analysis. We believe that the FCC, using whatever test in its judgment was appropriate, needed to look at the competitive conditions, the state of competition in the enterprise market. And, Your Honor, I would point you quickly to... How about the state of competition in the mass market? It seems like there is... We're not challenging that part of the order. Well, it seems like there's robust competition in the mass market, so you indeed can lift the non-discriminatory rules as to the mass market, but what you're asking for is that as to the enterprise market, that those rules not be lifted. That's correct, Your Honor, and if they are lifted, only after the FCC has gone back and examined the state of competition in the enterprise market and justified why it is that eliminating this Title II compulsory regulation is appropriate. We don't think they'll be able to do that, because the evidence is so overwhelmingly showing that the ILFs continue to maintain monopoly power. Your Honor, I would quickly say that the Irkland decision that the FCC submitted as a 28-J, if you look at Section C of that decision, which starts at 462 F-3rd at 11, the D.C. Circuit said we will uphold the FCC's decision to forbear in that case, and we'll do it because of the very strong record evidence, quote, including cable's maintenance of a broadband market share on the order of 60%. This means that even if all competitive local exchange carriers were driven from the broadband market, mass market consumers would still have the benefits of competition, and given this state of competition, this mitigates the impact of forbearance on competition in the mass market, and you don't have that in the enterprise market. That's the type of analysis that needed to be done and wasn't, Your Honor. Thank you. Mr. Mary. Mr. Carr. Yes, sir. May it please the Court, my name is James Carr. I represent the Federal Communications Commission. Judge Fuentes, earlier you identified what you thought were two issues in this case, and I'd like to initially give an overview, an outview of those two issues, and I think in both instances, the FCC's actions in this case flowed logically from the Supreme Court's decision in Grand X. After the Court in that case upheld the Commission's classification of cable companies offering high-speed Internet access as an information service and not a telecommunications service, it made perfect sense for the FCC to apply the same classification to a functionally identical service provided over telephone wires, and that's precisely what the FCC did here. To the extent Mr. Butler disagrees, he's really misunderstanding the FCC's order here. If you take a look at paragraph 9 of the Commission's order, which can be found at Joint Appendix 18, the Commission very specifically says that it's dealing here with something called wireline broadband Internet access service, and it says the term Internet access service refers to a service that always and necessarily combines computer processing, information provision, and computer interactivity with data transport. In other words, precisely the kind of integrated service offering that end users were getting from the cable companies, and Judge Pointes, as you noted, when you get a wireline service, you really can't tell the difference whether it's coming from the phone company or the cable company. You're getting an integrated service. You're not using that transmission for anything other than to get Internet access and related information processing capabilities. So there's really not much of an issue there, and I think it shouldn't delay the Court very long affirming the Commission on that ground. Now, moving to the second point, the Court in Brand X also held that it was reasonable for the FCC, in response to changed market conditions, to conduct a fresh analysis of its 25-year-old computer inquiry rules, which had historically applied only to telephone companies. In view of the availability of multiple Internet transmission sources, the Supreme Court upheld the FCC's reasonable decision not to extend the computer inquiry requirements to providers of cable modem service, which held 60% of the consumer market for high-speed Internet access. Now, once the FCC had determined, with the Supreme Court's approval, that it was not going to apply these common carrier regulations to the clear market leader, the cable companies, it made no sense, in the FCC's judgment, to continue applying those regulations to the second-place competitor in this market, the telephone companies. And indeed, the records in this proceeding show that this sort of asymmetrical regulation, this regulatory disparity, focusing only on phone companies while all the other competitors in the market were unregulated, was actually having a deleterious effect on the deployment of these high-speed broadband services. It was discouraging innovation and investment. Do Internet service providers use the cable platform more than the wireline platform, or is it the other way around? Well, prior to this order, there was more of a wholesale business with respect to the ISPs who were getting their transmission, many of them from the wireline companies. But some of them were also getting service from cable companies as well. There are also other platforms as well. Right here in Philadelphia, there is the development of a municipal Wi-Fi system where there will be wireless Internet access available to consumers. And my understanding is that that should be available to everyone in Philadelphia by the end of this year. So that provides yet another platform. And my understanding is that Earthlink is involved in that municipal Wi-Fi project. Is this order stayed pending appeal? Is this order stayed pending appeal? No, Your Honor, it has not been stayed. It hasn't gone into effect yet? It has. Is it in effect? This order is in effect, yes. Yes, Your Honor, absolutely. So the petition is to vacate the order and send it back to the agency for reconsideration? I take it that's what the petitioners are asking for, yes. You know what I was thinking? Maybe you could help me. With regard to the removing of the non-discriminatory rules, I was thinking of maybe the not-so-big Internet service providers that want to break into the business. There may be startup companies somewhere along the way that want to get into this Internet service providing business. But because of the removal of the non-discriminatory rules, the ILICs can pretty much charge whatever they want, so that the competition may not be as robust as maybe it appears on paper. I think the Commission addressed that concern in this proceeding because it said that even after these regulations were lifted, it believed on the basis of record evidence, on the basis of its expert judgment about economic incentives, that the incumbent carriers here would continue to have strong business incentives to offer wholesale transmission on reasonable terms and conditions. And here's the reason why. Building out these networks costs a lot of money. And the Commission's feeling was that once there was more and more build-out of these broadband networks to deal with the increasing demand for service, frankly, both cable companies and phone companies would have incentives to spread the costs of the network build-out over as many network users as possible. In other words, they would try to sell transmission to as many users as they could, not just retail users, but wholesale users as well. And the important thing to keep in mind is, what the Commission did here was, it lifted common carrier regulations, it gave the phone companies the option to either continue offering this on a common carriage basis, and apparently some of them are planning to continue to do so. I gather there's no limit to the number of users that the ILEX lines can accommodate. I honestly don't know about that. Maybe Mr. Kellogg, who represents the ILEX, can address that question. But I don't have a sense of the limit to the capacity. Are you answering that in a technical sense, what they physically can do or what they legally can do? I'm sorry, Your Honor. You're answering that in a technical sense. You just don't know technically. In a technical sense. That's correct, Your Honor. That's right. How about legally? Legally, they are free to deal with all of these customers as they see fit. The point is, they could offer service on a common carriage basis or a private carriage basis and negotiate private contracts. When Counsel for Earthlink was up here talking about discontinuance of service, about all of their service being shut down, that's not what's happening here. What's happening here is that to the extent there is a discontinuance, the companies are announcing that they're no longer going to offer this on a common carrier basis, which still means they are likely to negotiate these private contracts, particularly with major information service providers like Earthlink. My understanding is there have been about 60 of these discontinuance notices filed with the FCC. There has not been one objection or complaint lodged that people are losing service in any way. Presumably what is happening is what the FCC expected to happen, that when these companies get out of the common carriage business, they are negotiating privately tailored deals to particular information service providers. Indeed, some of the information service providers in this proceeding actually advocated that sort of approach. They'd much prefer being able to have a narrowly tailored agreement that suits their needs, and that was something that was difficult to negotiate when there was a common carriage requirement where everything had to be offered on an indiscriminate basis. I wrote an opinion recently which I pointed out that we're used to dealing with horribles. Is that what you wrote? Yes, Your Honor. The outcome of this is going to be horrible. Yes, Your Honor. But suppose the horrible that is posed here came to pass. Would the FCC take any action? They projected that it was closing out. I think, Your Honor, the FCC would be obligated to take some action, and it's the FCC's obligation over time to revisit its predictive judgments. Obviously, Judge Blankens, as you noted, part of the FCC's job is to make predictive judgments. When you have a dynamic industry, as communications is, the Commission has to make some projections about the direction in which the market is going. But the Commission will occasionally have to revisit those decisions to determine whether or not they're right. Actually, what the FCC did in this case was revisit a decision that it had made 25 years ago in a market that was much different. In the early 1980s, when the computer inquiry requirements were first imposed, you had a genuine bottleneck monopoly. The phone companies were regulated as a natural monopoly. The telephone network was the only conceivable source of transmission for these data processing services. No one foresaw any other alternative transmission source. And much has changed in the last quarter century. The market for high-speed Internet access has never been confined to a single source of transmission. As the Supreme Court noted in Brand X, unlike at the time of Computer II, multiple substitute sources of transmission exist today. Not just wireline, but cable, wireless, and satellite. And more are in development. That's true. That's true. We've invested millions of dollars in broadband and for power lines. But realistically, aren't there really only two primary platforms, cable and wire? The others that you mentioned really are not major players in this. But they're in the process of developing, and the SEC predicted that. Keep in mind, you still have a market where there has not been very much penetration, where we expect much to change in the coming years. In Philadelphia alone, Your Honor, there are at least three alternatives. Not just cable and phone, but the Wi-Fi system which is coming up is going to be another alternative for consumers. As I was mentioning, Earthlink has invested millions of dollars in a broadband over power lines project. The Washington Post reported just last Tuesday that Microsoft is looking into the possibility of being able to use island television channels, that is, white space on the broadcast spectrum, in order to provide high-speed internet access. What all this shows is that there are plenty of people who are looking at alternative ways of developing transmission platforms. There's already more than one transmission platform which makes this different from the computer inquiry situation. There's already intense competition between cable and the phone companies, and that in itself makes this different from the computer inquiry requirements, and that justified the commission's determination that they simply were no longer required, particularly when it meant that the commission would be continuing to regulate the second-place competitor in the market. That just made no sense. So what does it mean that someone like, an entity like Earthlink can use, deliver its services over a wire, but it can also deliver its services through any of these other emerging platforms? It could, if it negotiates a deal with a cable company or someone who's providing wireless internet access. And my understanding is there are cable companies in the wholesale market. That's the point. Now, keep in mind, too, that the focus can't be just on the wholesale market. Ultimately, the public interest is what's available to consumers. To the extent that consumers have developed a certain brand loyalty to companies like AOL and Earthlink, it seems unlikely that the phone companies are going to stick these companies and keep them out of the market where there are so many customers who want that service, particularly when the phone companies are in intense competition with the cable companies about that they're going to do what they can to accommodate new customers to try to compete better with cable modem service. Quest pointed that out in its comments, and the SBC cited them in its brief. If I could, I'd like to move to the more specific question that Mr. Murray addressed about this enterprise market. I really think Mr. Murray is raising a red herring here. As I understand it, his concern, the business community's concern about the services they're interested in, and Time Warner acknowledged that enterprise customers are interested in different services, residential services, residential customers. Most of those services are these large, high-capacity, high-speed transmission services. Time Warner itself identified them. There's something called asynchronous transfer mode, or ATM. There's something called gigabit Ethernet, trade relay. Essentially, they're big pipes that allow businesses to, and they're not used just for Internet access. They're used for all sorts of purposes that businesses use for their telecommunications needs. Now, in paragraph 9 of the commission's order, Joint Appendix 18 and 19, the commission specifically distinguished what it was dealing with in this order, wireline broadband Internet access, from standalone offerings of precisely these big pipe services that concern the business community, standalone ATM service, frame relay, gigabit Ethernet. Those services, the order expressly states, remain subject to current Title II obligations. In other words, they're still available after this order as common carriage, as telecommunications services. So it's not really clear to me what Mr. Murray is complaining about. What he seems to suggest by the time of this reply brief is that he's concerned that these companies, the phone companies are going to focus more of their attention on the transmission they use to provide Internet access, and they're going to let these standalone offerings go to seed. Well, that's an awfully speculative judgment, and if it comes to a question of predictive judgment of Time Warner and the predictive judgment of the SDC, the expert agency should get the deference here. Another thing that Mr. Murray mentioned is this 2AO report on special access. To the extent he's complaining about special access, once again, this order does not deal with that issue, and paragraph 9, footnote 24 of JA-19 specifically notes that there are pending proceedings dealing with other issues that may be of concern. One of them is a special access rulemaking. So if he's complaining about special access, he's in the wrong proceeding here. This is dealing with wireline broadband Internet access, and it's not really apparent that he has much of a complaint. To the extent that he's... He mentioned the Earthlink case, and we sent a 20HA letter to the court because it was decided after our brief was filed July of last year. I just wanted to point out, because Mr. Murray has been saying that it's so obvious that there is a broadband monopoly on the side of the enterprise market, I wanted to point out that the order that was affirmed in Earthlink was known as the Broadband 271 Forbearance Order, and it actually was cited in the order on review here. Paragraph 56, Joint Appendix 42. The commission said, we expect these two market leaders, cable and the phone companies, to continue to compete head-to-head in a way that could result in higher customer penetration rates for one or both services. Then it's cited to this Broadband 271 Forbearance Order, paragraph 22 of that order, and I just wanted to read from that a couple of things because that paragraph deals specifically, not just with the mass market, but with the enterprise market as well. The commission there said, the record demonstrates that cable operators have had success in acquiring not only residential and small business broadband customers, but increasingly large business customers as well. Now the commission then goes on in a footnote to recognize that cable companies are not as prominent in the enterprise market as they are in the mass market, but they still are competing in that market. Moreover, the commission notes that there's other competition as well. Because competitive flex, that's local exchange carriers, can still obtain access to network elements under Section 251 to serve business customers. In other words, to compete with incumbent phone companies. And because of actual and potential intermodal competition from other services, we find that forbearance from Section 271, that is deregulatory relief in this case, is warranted. In short, what the commission found in the Broadband 271 forbearance order was that to the extent there was an issue involved about internet access in the wholesale market, in the enterprise market, that there was some competition there, and that we expected it to grow. To the extent that these petitioners are saying that the commission did not conduct a market analysis, I think that's unfair, as we explained in our brief. We did conduct a market analysis. We did not feel that we could look at static data, given that the market was changing so dramatically and was likely to change over time. Instead, we looked at larger trends for competition, and the SEC made a reasoned judgment in light of those trends and in light of the changed market conditions that it was time to change rules that had outlived their usefulness. Did you do a market analysis in the cable modem case, in the Braindex case? No, Your Honor. In fact, if anything, we did more of a market analysis. Maybe I shouldn't be so quick to say no. We didn't really focus as much on the market analysis there as we did in this case. And to the extent there's an argument that somehow this was unprecedented,  the Broadband 271 Forbearance Order effectively adopted the same sort of framework for market analysis, that this was an emerging and dynamic market, and that it didn't make sense to look at it at one point in time, but rather to make more general projections about how it would develop, and that there was no indication that this market was going to develop in a way that would create this sort of bottleneck monopoly that had been the basis for the computer inquiry requirements in the first place. Mr. Carr? Thanks very much. Thank you, Your Honor. Mr. Kellogg? Thank you, Judge. I just want to make two points to supplement Mr. Carr's argument from the industry perspective. And the first concerns Earthling's argument that the SEC was wrong to remove a wholesale obligation on telco provision of broadband, because that would leave providers like Earthling without any transmission platform. Judge Buendia, as you pointed out, the order has been in place for some time,  Indeed, Earthling's most recent 10-K filing with the SEC, which was filed just two weeks ago, there's no less than five separate platforms that Earthling is using. Is that part of the record, Judge? It is not, Your Honor. I alerted counsel that I plan to refer to it. I just became aware of it recently. It is a publicly filed document with the SEC. It's also available on their website. They have five separate platforms that they are using. First, wholesale agreements with telephone companies, both under the old regime that are continuing on, but also newly negotiated agreements. Second, they have wholesale agreements with major cable providers, such as Time Warner and Comcast. Third, as Mr. Carr pointed out, they're investing tens of millions in broadband over Powerline, which their CEO is touting as the new, new thing. They use satellite transmission and- I don't know if this is proper. It's not part of the record, is it? Did you make a motion to supplement the record? Your Honor, it is. The court can take your- But it is locked. It is locked. Oh, I don't know that the court can take initial notice of a private file. Well, anyway, the broadband over Powerline issues are in record. We cited them in our reply brief, Your Honor. I don't know if you made a motion to supplement the record. Since Earthquake apparently filed this, Earthquake would have difficulty in opposing the motion. Your Honor, I'll be happy to make such a motion after the argument and submit the relevant materials, as well as the case law indicating that it is okay for the court to consider such materials. Also, there is the Wi-Fi platform. It's the fifth platform. It's right here in Philadelphia. I could actually take my laptop, open it here at the podium, and access the Internet via Earthlink's service without touching any telephone company platform. Recent statistics published by the FCC show an explosion in wireless broadband. In the last six months alone, it's gone from 7% of all broadband lines to 17%. Now, part of the FCC's point here was removing the regulatory straitjackets on these wholesale relationships. We actually encourage information service providers, such as Earthlink, to go out and explore alternative platforms and develop alternative platforms. And that's precisely what we see happening. And Telcos themselves, my clients, have every incentive to reach and are reaching wholesale agreements because we're building incredibly expensive networks, and we're spending tens of billions of dollars to put all this huge capacity and make it available. And we want traffic to be running over it. We don't want it to be going to our competitors, the cable companies, et cetera. So their argument that there are no wholesale platforms is simply not correct, other than the Telcos. In any event, the more important point, as the FCC pointed out, is what consumers and users are benefiting. And there the evidence is clear as well. Prices are falling, and output is expanding rapidly. Consumers are getting the benefit of this. And particularly when the major player is the cable companies, who have a big lead on telephone companies, it would make no sense to have special restrictions on the second-tier providers. 43 economists, in the record, file an affidavit. Very prominent economists all say, this is a crazy regime. It is distorting competition and is going to impede the development of broadband. Where is that in the record? The 43 economists? Your Honor, we cited it in our brief, and it's actually in the joint appendix. I'm sorry, I don't have the site at my fingertips. I asked before, is there any limit to the number of internet service providers that could use the wireline transmission service in a particular island? No. It's just a question of having wholesale agreements. Quest, for example, has an agreement with numerous ISPs. They call it their DSL host service. It's just the sort of creative agreement that the FCC wanted to promote that allows numerous ISPs to combine with them to provide service. This may be off the wall, but in other words, there's no way that an ILEC, or maybe there is a way, that an ILEC would strike a deal with a particular ISP to give that ISD complete usage of an ILEC's facilities? In other words, to allow that sort of monopolistic usage of the wireline facility? Well, first of all, you know, I object to monopolistic because it is only one platform. But, yes, we are having wholesale agreements with ISPs that allow them to use our transmission facilities, and we have every incentive to intercede. So you might be related to exclusive dealing. Yeah, right. That's right. In other words, I don't know if AOL is an ISP, but if AOL goes out and says, look, let's make a deal. I'll pay you X number of dollars. Just let us handle the customers that you deal with, and we'll pay you X number of dollars. Everybody else is pretty much out of the picture. Can that happen? Well, there'd be a potential interest analysis of that issue and whether we had market power and such in making an exclusive arrangement of that sort. But I can't see, given the multiple platforms involved, that I can see any problem with that. One of the key things put out is the FCC recognized and the petitioners don't even dispute the huge costs of these wholesale requirements in terms of engineering our network, setting up special accounting programs. The record evidence showed that they add as much as $6.58 per customer per month to the cost of providing DSL service. And the FCC rightly concluded that that impeded infrastructure development, it harmed consumers, and in eliminating these costs and allowing market decisions to be made would actually bolster this market, which is still in its early phases. The commission made a similar decision 15 years ago with respect to wireless services. They were urged left and right to impose lots of regulation on beginning wireless services, and they declined to do so. They said, no, we're going to wait and see how the market develops. And wireless has become a poster child success story for competition because the FCC, as they did here, said, look, we think this has the potential to be a very competitive market. We see all these platforms developing. We're not going to impose regulations and distort it now. We're going to wait and see. They opened a proceeding to say, let's see how it's developing and let's see whether we need to impose rules across the board on all platforms, not just on one. Now, if I may, I'll just turn very briefly to the so-called enterprise issue. Mr. Carr is absolutely correct that the FCC focused on DSL service, on functionally integrated DSL service. But that's not what Tom Warner is complaining about in his brief. As their opening brief acknowledges, page 30, note 9, large business customers demand very different services. They don't get DSL from us. They use super high-speed services, which Carr mentioned a few, ATM, GDBET, Ethernet, frame relay, and those are expressly excluded from this order. Those fall under the unbundling regime under 251, 252, which has already been approved and affirmed by the DC circuit. Again, if I may, as I said, I'm going to submit this after the argument. I'll refer to Tom Warner's most recent 10-K, in which they explain to their shareholders why the FCC's order doesn't hurt them. And they say, and I quote here, since the FCC expressly excluded from this classification special access and Ethernet transmission services we require for off-net building access, those services currently remain subject to regulation as telecom services. So what they're doing is they're piling speculation on speculation that the services that they do get now that aren't changed and that they do need are going to be somehow neglected by the telcos in favor of developing their Internet access services. But these enterprise customers are our most lucrative customers. We can't just stop providing the best, the fastest services to them. And these are the very services that the FCC in their unbundling order found are the most competitively provided because they're to large enterprise customers because they're so lucrative. Does the court have any further questions? Mr. Kellogg, thank you very much. Thank you. Mr. Kellogg. That's all right. That's my station. I am the chair of the economist's affidavit. It's trade offendance in 2259. Thank you, Mr. Kellogg. You can understand why we don't know every page of every thing. I don't. 2259, this is our only case. This is a WC by two arguments. Thank you, Mr. Kellogg. Mr. Butler, you have one minute. Both the FCC and the interveners have pointed you to paragraph nine of the order, and that's the crux of it right there. The reason that the services that Mr. Kellogg just described are carved out of the operation of this order, the reason they are telecommunications services, the reason given by the commission is that they are offered on a stand-alone basis. They are not mixed with another service. The facts in brand X were that the cable transmission there was never offered on a stand-alone basis. That was the determinative fact. Here, set inside the carved-out services in paragraph nine, the record is clear that DSL, although it is sometimes offered on an abundant basis, it is also sometimes offered both at retail and at wholesale on a stand-alone basis. Brand X, cable, DSL, the determinative facts are different. The commission relies on nothing but brand X for its statutory classification decision. Forget all this policy talk. That's not what's before the court. The facts are different. The facts matter. They cannot rely on that under Chenery. Thank you, Mr. Butler. Ms. Lambert, you have two minutes. The FCC here has essentially relied on predictions of what would occur after its order went into effect. The fact is, however, Earthlink went to the FCC during the entire 12-month transition period and explained to the FCC what in fact had occurred. AT&T, the nation's largest telephone company, refused even to provide a term sheet during all that time, and here we are 16 months later, and they've not offered a contractual agreement. It's also not part of the record. That's true. In addition, the question before this court is not the broadband Internet access service, whether that's properly classified as an information service, but whether the stand-alone telecommunications service should remain as a stand-alone telecommunications service, and the FCC has failed to conduct the analysis of the present alternatives that customers like Earthlink have, and as we show that any competitive contract is not only possible, it's likely and probable, and that's what in fact has occurred. Twenty consumer groups from around the country representing all of the users of these services explained at J.A. 1396 all of the kinds of incompetitive conduct which will occur because we have no alternatives in vast portions of the country, and to the extent that there are alternatives, the FCC has a lawful path, a path at issue in the Earthlink case they referred to before, Section 10 forbearance, which it completely ignored here, to the extent the facts would bear them out on the record, they could say in those circumstances, of course they can discontinue the telecommunications services, but when there is not those alternatives in the many, many areas in this country, and the FCC concedes it in the order, there are no alternatives whatsoever, and any competitive conduct is therefore probable in those circumstances. Thank you. Mr. Lambert, thank you very much. Mr. Murray? Yes, Your Honor. The FCC and the interveners make much of the transmission facilities identified in paragraph 9. The problem is what happens when the ILX move to the next generation facilities. That's exactly what the computer inquiry rules were designed to deal with, and the FCC has utterly dropped the ball on this point. They're also playing a little bit of a show game. What's going to happen when the ILX move to the next stage? They will have no obligation whatsoever to make those facilities available to competitors, and every incentive to exploit those facilities for themselves, and because they're the bottleneck facilities into your courthouse and building across the river, that is going to have a deleterious effect on competition and ultimately consumers. And it's ironic, Your Honor, in that right here in Philadelphia and the entire Verizon region, Verizon has no title to compulsion anymore because the FCC permitted the Verizon forbearance petition to go unacted on, and it's now been being granted. So they have no title to obligation in Philadelphia or anywhere else where they serve. I find it remarkable that the agency is relying on that, particularly in this particular environment. And lastly, I think the Court should be disturbed that the FCC points to a footnote in its order as the basis of dealing with the enterprise market, which is the backbone of our national economy, and when you look at that footnote, they cite to a series of paragraphs in the 271 forbearance petition, 22 through 29, and this is what they're trying to peg their hat on with respect to the enterprise market. They dropped the ball. It's far too important of an issue for them not to look at separately and get right, and this Court should send it back. Thank you, Mr. Murray. I think it would be helpful for the Court to get a transcript of these proceedings, so I would ask counsel to confer and share the course and speak to the Clerk about ordering a transcript. The arguments are very well presented, and we certainly appreciate them and appreciate being put by counsel. It's a very complicated case, and we have a lot to get through, so we will take the case under advisement, and we will adjourn. Thank you very much.